Hear ye, hear ye, hear ye. The United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States and his honorable court. All right, good morning, counsel. Welcome to Fifth Circuit Argument via Zoom. Appreciate your cooperation with our technology staff and in working through this and being here this morning virtually. So we're ready for the first case, which is MoneyGram International v. Commissioner of Internal Revenue, and we will first hear from the petitioner. Whenever you're ready, Mr. Street. May it please the court. As a leading case explains, banks receive favorable tax treatment, quote, because the surplus of banks must be built up for the protection of depositors, end quote. Section 581 represents a policy judgment by Congress that if an entity performs the essential functions of banks and if it is regulated by state banking regulators such that it has to hold reserves to back up those deposits, then that entity is entitled to deduct its reserve related losses against ordinary income. The question presented here is thus not whether MoneyGram perfectly mirrors in every respect a state or federally chartered bank, but instead whether MoneyGram satisfies functional statutory criteria that implement the statutory purpose I just mentioned. Well, Mr. Street, let me ask you, your client is registered with the Department of Treasury as a money services business, and Treasury Department regulations say a money services business cannot be a bank. So why doesn't that resolve this case? Because that suite of federal regulations is referencing federal banking law. Bank is a term with many different meanings throughout the federal code. Section 581 gives the term bank a specified definition with reference to deposits, loans, and discounts, and not a federally registered bank, but a bank regulated or subject to supervision by state or federal regulators. Now, Congress could have easily said a bank for purposes of Section 581 is a federally registered bank, a state chartered bank, an FDIC insured bank. It could have made Section 581 one line long. In fact, in seven other statutes, Congress has defined bank in just that way, but it chose not to do so here, and that's because it was promoting the policy purpose that I mentioned. Congress recognized that there were certain economically desirable activities that it wanted financial institutions to engage in, receiving deposits from the general public, and making loans and discounts. Congress understood that if an entity engaged in those activities and it was subject to state banking regulations like MoneyGram is, then it would have to build up a massive amount of reserves and safe liquid assets just as banks are required to do. When the economy crashed in a once-in-a-lifetime financial crisis, MoneyGram suffered crushing losses precisely because it had to comply with the same asset holding requirements, the same reserve requirements that banks must comply with, and MoneyGram satisfies the statute's functional criteria most clearly because it receives deposits through its money order and official checking businesses that are functionally identical to the deposits received by traditional checking accounts, and because MoneyGram makes loans and discounts when it discounts billions of dollars in commercial paper. Now, of course, there are a lot of other reasons we believe MoneyGram satisfies the statute. Those are the principal ones I want to focus on today. Turning to the deposit requirement, I start with the undisputed premise that traditional checking accounts involve deposits. I think everyone agrees with that. MoneyGram's money orders and official checks are indistinguishable in every material respect from the deposits received by traditional checking accounts. Well, isn't it, isn't it different in that your official check accounts, every day they're basically covering the checks that were issued the following day, so no one is really keeping a balance in there. Let me ask, would you consider the money people put in their accounts for toll roads, people go and put a hundred dollars in their account so they can drive on the toll roads and then that account distributes money even across the state sometimes to different toll road authorities? Would that be a deposit for safekeeping? It could be a deposit for safekeeping. It would not mirror traditional checking accounts nearly as closely as MoneyGram's official check accounts do. And let me unpack that a little bit with reference to the way you prefaced your question, Judge Costa. When MoneyGram takes the money into the official check accounts, first of all, there's a first day settlement and that money is not pre-committed in any way. Second of all, with respect to the money that's deposited to cover the outstanding official checks that have just been issued the previous day, that money is now held in safekeeping until those official checks are cleared. It could be days, it could be weeks, and it could be months. That's exactly the same as in a traditional checking account. It could be the case that, in fact, if you look at the statements that are in the record that mirror very much traditional checking accounts, there is, in fact, a balance, a balance held, many tens of thousands of dollars of balance because there's a delay between the deposit and the clearing of the account. In addition, you have complete discretion on the part of the financial institution depositor to use that account at any for anything it wants. So I think the toll situation, it mirrors a deposit in some respects, but the person who puts that in there can use it for tolls. It can't use it for anything. That's the way money orders and official checks are. It can't, generally speaking, it's going to be a lot harder to get that money out. You know, you can just walk back into MoneyGram and get your money out of the account whenever you feel like it. So I think, and that also goes to, I think, what a lot of the IRS's arguments. Let me just make sure I understand what you just said. On a money order, someone, my understanding is you can return the money order, but it's not like if I get a $100 money order, I know we're moving on to money orders now. I can't, if I have a $100 money order, I understand I can pay it to myself or I can even exchange it. I lose the fee, just like I can exchange a shirt I buy at the store. But it's my understanding, I can't, if I have a $100 money order I bought, go get $30 out of it or go get $60 out of it or $80. It's a full exchange or nothing. Isn't that right? That's right. That's right, your honor. And I think that point goes to a recurring theme in the commissioner's arguments, which is there are differences in the way checking accounts operate, which we would call, you know, the Cadillac account or the full bells and whistles account where you can withdraw at any time and the money order. Of course, the person who wants to withdraw partially a money order can easily do that. He can just go refund the entire amount and then put the additional amount that he doesn't want back on the money order. So there's no problem with doing that. But I think it's also important to point out that two things, even with traditional checking accounts, there are often withdrawal restrictions. There are often minimum balance requirements that prevent the depositor from going in and doing exactly what he wants to do with that money at any time that he wants to do it. And the second point is that this court has defined what a deposit is. It's defined it quite carefully and completely. And it did not include, as part of that definition, the right of unrestricted withdrawal. What the court said in the definition is that a deposit is a depositor such that they are payable on demand or at a fixed time. These funds are subject to the control of the depositor from the time the person purchases the money order to the time that they are the money order is presented for payment. The person who may either go and cash in the money order for himself, get a refund, or he can direct anywhere in the world that that money order goes at any time that that person wants to. Mr. Street, one question on the control question. So the way I understood what you just said is they have control over it up until the time that the money order is obtained for payment. But unlike, say, a checking account where you can put in a stop, you can stop a check or cancel a check even after you've endorsed it, I suppose you can't do that with the money order, right? No, not exactly, Your Honor. In the stipulated facts, if the money order, when I say presented for payment, I mean the payee has presented that money order for payment to the interbank checking system. And so essentially, if the depositor changes his mind and says, no, I want to cancel that money order, absolutely, they can do that just as with the check. That's in the stipulated facts. And getting back to Judge Costa's question, the real question here is the control issue, for one, but also the safekeeping issue. And on the issue of safekeeping, the money order and official checks mirror a traditional checking account. Once that official check is issued or the money order is bought, from that time forward, the money is treated by MoneyGram exactly the same as a commercial bank would treat checking deposits. It must invest that money in safe liquid assets. It must stand ready for days, weeks, or months to satisfy all outstanding obligations. And again, at any time, the customer has complete control over where to direct that money order. So we don't see any material difference between these official checks and money orders vis-a-vis a traditional checking account. I mean, a checking account people use for checks, but they also use to safekeep money. So people get their salary, their paycheck deposited into a checking account. Sure, they then pay some of that out with personal checks. But is anyone using money orders to keep balances beyond the money order itself? Well, I have a couple points in response to that, and first of all, I don't think there's any material difference in the way people are using checks and the way people are using money orders. Money orders have been referred to as a one-shot checking account for the poor man. It's just that it's only a one-at-a-time situation. Now, the reason you have checking accounts, as your honor said, is checks. The very function of a checking account is to write checks on that account. Money orders are exactly the same. The difference that your honor pointed out, I think, boils down to, at most, the difference of duration. You may have money that sits in a checking account for a little bit longer, but again, money orders can sit in there for weeks or months, and they remain subject to the complete discretion of the depositor. And the key point on safekeeping, I think, is why is the depositor handing over his money to MoneyGram? And he's handing it over to MoneyGram, we know from customer surveys, because MoneyGram keeps that money secure. And it's not just that MoneyGram keeps the money secure when it's transferring it, it's that it keeps the money secure from the time that it's deposited from the time that the check is presented for payment. And that's precisely the same as with a checking account. The Ninth Circuit said in the Valley case that the thrift certificates that were purchased in that case were purchased for safekeeping because the customer trusted in the security of the thrift maintenance of those funds, even though those funds were later possibly going to be reassigned to a third party or possibly returned to the person who deposited it. If I could, I definitely want to hit any more questions on deposits, but if I could quickly turn to loans and discounts here for just a brief few minutes. I think the quickest way to resolve the loans and discounts issue is to look at the commercial paper that MoneyGram purchased directly from the issuers. That was $6 billion. The tax court held that those purchases, they assumed without deciding that those purchases were loans and discounts. And the commissioner does not dispute that on appeal that the issuer purchases were loans and discounts. We think the court can just look at that and say, this is an undisputed issue and $6 billion of purchases that are necessary to maintain the legally required reserve of regulations is a substantial part of MoneyGram's business. Mr. Street, you're saying that your argument is discounts meet the substantiality requirement, and there the statute does say the loans and discounts are relevant to that. But for the preliminary question of whether it's a bank, which our prior decision says turns on deposits and loans, what's your argument for why we should treat the discounts as loans for purposes of that definition? It seems to me the statute's treating loans and discounts as separate things, given the different words it uses. Well, I don't think so, Your Honor. And if I'm understanding your question correctly, it's that the deposits have to be used for loans. I think that's what this court said. That's also what I'm saying. I understand why discounts matter for the substantiality question. But the first question is, is it a bank? And our prior opinion says it's a bank if it makes deposits, and then we explain what deposits means, and if it makes loans. No mention of discounts. And in proving that the bank makes loans, correct me if I'm wrong, but I think you're trying to say in showing that the bank makes loans, which would meet the definition of a bank, we can consider the discounts. And I'm saying why should we consider the discounts if the statute itself seems to treat loans and discounts as separate items? You do correctly understand my position, Your Honor, and that is that the discounts are by definition loans. And I don't think that the fact that this court has separately used the term loans, it does not necessarily mean that the term loans cannot be encompassed in the statutory term discount. And I think we've shown that by the Supreme Court. Well, I'm saying the opposite, and it's not how we've used it. Congress in the statute says loans and discounts. So why doesn't that mean they're distinct things, given that Congress used those separate terms? And I'll give, Kim, if you can give two more minutes, and I'll give the IRS two more minutes, extra minutes as well. Sure. Sure. So loans and discounts, absolutely, if you were just applying the canon against surplusage, those would be distinct things that would need to be given different meanings. But the canon against surplusage gives way to the fact that there are certain terms of art that are used as doublets or triplets and essentially mean the same thing. And as we point out at page 7103 of the record, the elementary banking treatise, which was contemporaneous with the enactment of the statute, loans and discounts have always been treated to mean the same thing. Loans are a subset of discounts, or I should say discounts are a subset of loans, and the Supreme Court has treated it that way. We cite those cases in our reply brief and in our opening brief. So I think our position is very much, as Your Honor articulated, that the commercial paper purchases, both from the issuer and from the agents of the issuers, are both loans and discounts. Now, the issuer purchases are clearly loans, right? That's just somebody coming in and saying, please give me $990 now, and I'll give you $1,000 in 30 days. That's canonically a loan. A discount is canonically when a bank purchases that commercial paper from the original recipient. That's in all of the treatises. That's in the officer of control or the currency guidance that we cite in our brief. So those are clearly both loans and discounts. The Court doesn't need to reach the asset-backed securities if it doesn't want to, but it can reach the same result through that. Now, the IRS's position on the issuer or the agent purchases seems to be that we are not the underlying lender in that case. But again, the OCC guidance and the original contemporaneous treatises treat both the third-party purchases and the issuer purchases as loans. And when you think about it, the stipulated facts demonstrate that fact very clearly because it says the agents are just agents of the issuer. They're just somebody retained by the issuer to place the commercial paper. It's no economically different from purchasing directly from the issuer. I see my time has expired. All right, you have your time for rebuttal. We'll now hear from Mr. Rosenberg. Good morning, Your Honors. May it please the Court, Isaac Rosenberg for the Commissioner. Are you all able to hear me okay? Yes. Okay, great. Thank you. To prevail here, MoneyGram has to convince the Court that it satisfies each and every element of the term bank under Section 581. And it doesn't principally for two reasons. First, MoneyGram does not accept deposits. And second, MoneyGram does not use deposited funds to make secured loans. MoneyGram's position is extreme, and it strips the terms bank, deposits, and loans of their context. And MoneyGram cannot change the realities of its business with labels, analogies, or abstractions. The Tax Court properly granted summary judgment to the Commissioner for that reason, and this Court should affirm. I see that the bulk of the conversation focused on deposits, and I'm also going to focus on deposits because the other elements of banking depend on the accepting of deposits. But rather than start with official checks, I'm going to with money orders, because I think if the Court understands how MoneyGram sells money orders and treats those proceeds, it will reveal a lot of inconsistencies and fallacies in MoneyGram's position on the official check business. So the first element, the first pillar of a deposit, is the purpose of safekeeping. And the purchaser of a money order does not buy a money order to safekeep funds. Safekeeping funds is really the choice between putting money in your mattress and putting your money in a bank. Now, banks also offer an additional privilege to account holders, some account holders, to write checks and to pay third parties. But there is a distinct and important distinction between safekeeping and deposit accounts. MoneyGram recognizes this distinction between safekeeping and transmitting funds, right? This is on pages 29 to 30 of the Blue Brief. But on page 32 of the Blue Brief, they say that a money order basically collapses the safekeeping function and the payment function. In reality, a purchase of a money order skips safekeeping altogether. So, for example, if I give my friend a $20 bill to write a $20 personal check to pay my landlord, you would never say that I gave my friend the $20 bill for safekeeping. That's essentially what a MoneyGram money order purchaser does. They give MoneyGram money so that MoneyGram will pay a third party with MoneyGram's funds. Money orders are drawn by MoneyGram on MoneyGram. So the funds that are paid on a money order are MoneyGram's funds, and MoneyGram is liable on that instrument. Once a person buys a money order, MoneyGram doesn't owe them anything unless they write the instrument out to themselves, and then they're just stepping into the shoes of a payee, and the payee of a money order is no different than the payee of a personal check. They're not a depositor of the institution that issued the check. Mr. Rosenberg, I don't understand the idea that this isn't safekeeping for the following reason. Suppose I get paid every two weeks working my job at a construction site, and I get paid on a Friday, and I go straight to MoneyGram, and I get three checks. I get one for my landlord, I get one for my truck payment, and I get one for my groceries. The money is in safekeeping in the sense that I'd rather have those three checks, both because I'm not going to spend the dollars, but also because I would rather have those than whatever $1,000 in cash. It strikes me that at least in a common understanding of safekeeping, the money is safe in that sense anyway. Well, the person who buys a money order expects MoneyGram to honor the instrument, but that is not equivalent to safekeeping, because if that were all it took to render the acceptance of funds, the safekeeping of funds, then MoneyGram's money transfer business would also involve safekeeping, because functionally, other than the piece of paper that looks like a check, there's no difference between their money is very clear. They don't consider their money transfer business to involve deposits and therefore does not involve safekeeping, but yet they contend that their sale of money orders does. The only real difference is, again, the piece of paper and perhaps the amount of time between when the person hands their cash over to MoneyGram and when that cash is available to a third party. But it's safekeeping, and I mean, maybe I'm misunderstanding your answer, but it's safekeeping in the sense that if I'm now holding three MoneyGram checks, money orders, excuse me, if I'm holding three MoneyGram money orders, I can have confidence that those will be redeemed for their face value when it comes time for my landlord to whatever, cash the check or for my car, my truck company to cash my truck payment. It's safekeeping in that sense, right? I mean, the money has left my hands and I can be confident that it will be paid when the checks are redeemed. Yes. Again, money order purchasers do expect MoneyGram to honor the instruments, and that's why they choose to go through MoneyGram, but that's not a risk-free proposition. And when you deposit funds in the bank, those funds are safekept for you. There's no risk that, you know, or rather, even if, for instance, the bank went under, at least you have FDIC insurance and money order purchasers do not have that. The principle points out that that's not in the statute. There's no requirement that the bank in 581 cents has to be FDIC insured or federally chartered or any of that stuff. That's right. But what MoneyGram wants is to take advantage of a special privilege that only applies to banks, when in every other aspect of its business, it shuns the burdens, financial and regulatory, that go along with being a bank. Again, the fact that money order purchasers trust that MoneyGram will honor the instruments when they're presented reflects, I think, what MoneyGram sometimes refers to as safeguarding, but it's not equivalent to safekeeping in the traditional banking sense. And perhaps, you know, a little bit of history might be helpful. The money transfer and money order industry has existed for over 100 years. And I'm unaware of any case, and MoneyGram hasn't cited a single case where the seller of money orders or the transmitter of money like MoneyGram or Western Union Travelers Express was ever considered a bank for purposes of Section 581 or its predecessor statute. So this is an unprecedented expansion of prior case law. It is not consistent with the traditional understanding of bank safekeeping. But again, that's only one element. And then MoneyGram, until the years it wanted to claim these investments as deductions, it listed itself on its tax returns as a non-depository institution. Consistently, is that right? That is correct. And even in the tax returns where it claimed this deduction, it still used the industry code for a non-depository credit intermediary. And again, emphasis on non-depository. So again, safeguarding is just one of three essential elements of deposit status. And money orders don't satisfy the threshold safeguarding element. The second element is whether the depositor can exercise control over the funds, right? Withdraw them on demand. And the person who buys a money order once they've paid for the money order has no control over the funds. They simply have control of the piece of paper. So MoneyGram emphasizes in their briefs, well, the purchaser of a money order can decide when to give it to the payee. And so that's like deciding when to withdraw funds from your account. But even when they hand over the piece of paper, they don't have control over the funds. They can't go to MoneyGram and get the money back. And unless they step into the shoes of a payee by writing the they can exert no meaningful control over the funds in the ways that a real bank depositor does. And it's categorically unlike the types of control that the depositor could exercise in the Morris Plan Bank case of New Hampshire, Morris Plan Bank of New Hampshire case. And then the third element, essential element of deposit status is the existence of a debtor creditor relationship between the depositor and the bank. Now, the person who buys a MoneyGram money order is not a depositor because they're not entitled to the funds once they've given their cash over to MoneyGram. Only the payee is entitled to enforce the instrument. So you have a breakdown between the person who's the putative depositor in the money order purchase and the reciprocal relationship, debtor creditor relationship between MoneyGram and the purchaser of a money order. And I think the court recognized in its prior opinion, and this is also borne out in the Morris Plan Bank of New Hampshire case, that the creation of the debtor creditor relationship is automatic. It arises immediately upon the payment of funds. There is no automatic and reciprocal debtor creditor relationship between the purchaser of a money order and MoneyGram. And importantly, if, for instance, MoneyGram went bankrupt, the mere purchaser of a money order could assert no claims of bankruptcy. What would their claim be? The only person who might be able to assert a claim against MoneyGram at a bankruptcy would be the person who's entitled to enforce the instrument, which is, in this instance, the payee. And again, just like the payee of a personal check is not a depositor of the bank on which the check is drawn, the payees of MoneyGram money orders are also not depositors. So, if the court doesn't have any questions on money orders, I would now pivot to explaining why the official check business does not involve deposits either. So, with the exception of the first day settlement funds, MoneyGram's official check business parallels their money order business, the retail money order business. You have an entity that is selling instruments. You have an agent ostensibly in, you know, rather the agent that sells the instruments. You have MoneyGram and you have the people who are basically buying these instruments.  The retail channel and the official check channel, MoneyGram is responsible or liable for paying those instruments. So, and the court should look at page 3568 of the Record on Appeal. It's paragraph 118 of the Joint Stipulation. MoneyGram, when an official check customer sells a MoneyGram instrument, it's selling an instrument on which MoneyGram is liable, just like the retail agent who sells a money order is selling a draft on which MoneyGram is liable. The customer bank takes in the funds, just like the retail agent takes in the funds, and then has an obligation to give MoneyGram's money to MoneyGram. At no point, really, are the funds that an official check remits to MoneyGram funds belonging to the customer bank. And again, another inconsistency in MoneyGram's theory is that they're very adamant that the retail agent, the convenience store or the supermarket that sells a MoneyGram money order is not MoneyGram's depositor. But in the same breath, they say that the customer bank that sells an official check is MoneyGram's depositor. But those two channels operate almost in perfect parallel. And so there's a fatal inconsistency in their theory as to who is the depositor. Mr. Resimer, can you help me understand why the exception of the first day settlement doesn't constitute a deposit? Because I take the services position that with the exception of the first day settlement, it looks the same. But that, of course, just highlights the distinction of the first day settlement. Right. So the first day settlement funds is very clearly for MoneyGram's security in the same way that a landlord requires a security deposit or certain creditors would require collateral before extending a line of credit or agreeing to enter into a trade relationship with a vendor. And, you know, the way that you can tell that is, number one, MoneyGram, rather, the official check customers don't have a choice as to whether or not to tender those funds that are required to do it in the same way that a landlord would require you to provide a security deposit. Second, I trust that the landlord is going to safekeep the security deposit. I mean, the very word security deposit is highlighting the deposit free nature of it. I'm wondering why it's not the same with this first day settlement. Well, again, because it's compulsory. The true purpose of providing that money is not because the customer bank wants to safekeep their funds, even though those funds may be held as security. So to the extent there's any safekeeping involved, that is not the principal purpose. And it is incidental to the real purpose, which is to provide MoneyGram security. So the first day settlement funds, again, the purpose of that is not for safekeeping. The second element you would have to have for the first day settlement funds to be a deposit would be some sort of control that the putative depositor can exert over the funds. The customer banks can exert no control over the funds once MoneyGram has it. They have no discretion to decide when to tender the funds, how much, can they provide more, can they take some out. Those funds are off limits for the entire duration of the relationship. And I think it's fairly telling that there's evidence in the record, these first day settlement funds are not always required. This is on page 22991 of the Record on Appeal. It's an affidavit that MoneyGram submitted in connection with summary judgment, acknowledging that when it's required or it may be required, meaning it's not always required. So the fact that it's really up to MoneyGram to decide whether they require first day settlement or not undercuts the safekeeping concept. And then beyond that, MoneyGram does pay interest on the first day settlement funds, but that interest is, again, incidental to the principal purpose, which is to provide MoneyGram security. And just in the same way that you can earn interest on a security deposit that you're required to provide to a landlord or to a utility company, you can get interest on your security deposit. But I don't think if given the choice, these customer banks would ever choose to provide the security or the collateral to MoneyGram because the interest that they earned on that was based on the federal funds rate. But MoneyGram makes money on these deposits. So money, why can't the banks, you know, why wouldn't the banks choose to make that same greater return by investing the first day settlement funds themselves? And the reason is because they don't have a choice. It's compulsory and it's for MoneyGram security in the event that the customer bank does not pay MoneyGram back within 24 hours for the checks that they sold on which MoneyGram is liable. So the first day settlement funds, again, as we stated in our brief, are clearly for MoneyGram security, they are in the nature of a security deposit that is categorically inconsistent with a safe-kept or safekeeping relationship. And then with respect to the daily remittances, those are reimbursements in the same way that if my friend, you know, lets me write checks out of her checkbook and requires me to pay her back the next day, the money that I pay my friend back is not paid for safekeeping, it's paid as a reimbursement. Because again, MoneyGram is liable on these official checks and the funds that the customer bank is tendering to MoneyGram are strictly reimbursements. So, you know, MoneyGram keeps likening the official check business and the money order purchases to checking accounts. Not only do you have, at least in the money order context, the complete absence of safekeeping, you also have an order of operations problem because there has to be some preliminary safekeeping function, however brief, before you have this additional function of making funds available, the money order purchases erase the safekeeping function entirely. And in the official check context, to the extent there is any incidental safekeeping, it is still out of, it's out of order. You have an order of operations problem. Mr. Rosenberg, one of the things that we used in the MoneyGram 1 opinion for the understanding of the term deposits is we looked at this 1911 decision from the Supreme Court called Ingle versus O'Malley. And when I read Ingle, it does, I agree with you, it distinguishes two different concepts. It distinguishes deposits made for safekeeping and deposits made for transmission to another. But it says both are deposits. And I'm curious how much we get out of the distinction of sort of the purpose of giving the money to a third person if both the deposit for safekeeping and to the deposit for transmission to another would both be a quote unquote deposit under Ingle? Well, I think the answer is supplied by Stanton. But again, Ingle does recognize, there is an essential preliminary safekeeping period, right? There has to be some period of actual safekeeping before this additional step of making money available. And unlike with a traditional bank or traditional bank account, every single dollar that MoneyGram accepts from its customers, it already knows is totally, completely, and immediately obligated for the payment of third parties. So when MoneyGram, what MoneyGram calls collapsing safekeeping and transmission, again, that erases the safekeeping function entirely. There is no safekeeping involved in a MoneyGram money order. I would want to touch briefly on loans. I have a little bit of time left. Judge Costa asked a question about whether the discounts can satisfy the loan element for the traditional concept of bank. Our position is no, it can't. Because again, what Stanton said was that you have to use deposited funds to make secured loans. Discounts generally don't involve secured loans. Commercial paper by definition is unsecured. So MoneyGram's focus on commercial paper is completely unhelpful to resolving that preliminary elementary issue on the first element of bank status under 581. And if it were so obvious that the purchase of debt securities was lending in the traditional banking sense, it's certainly curious that MoneyGram, from its petition, original petition in the tax court all the way through litigation in this court and the remand, never said that it made loans because it bought debt securities. They focused on the putative loans to the retail agents. And so the court should view that theory with some skepticism. But again, buying a debt security that is for the purpose of investment is not traditional banking. And real banks don't confuse the purchase of debt securities with lending. And what I mean by that is just look at the balance sheet excerpted in the Magruder opinion, which distinguishes between debt investment and loans. There's a Wells Fargo 10-K in the record. This is pages 23604 and 23610 that distinguishes between loans and investments in debt securities and the PNC 10-K at pages 23643 to 44 of the brief at length why MoneyGram doesn't actually make loans to its retail agents. If they don't, if those are not loans, which they're not, then MoneyGram can't even satisfy the first element of bank status under Section 581. I see I'm up against my time. If the court doesn't have any questions, we ask that the court affirm. All right, counsel. We'll now hear Mr. Streit gets, I think, five minutes. All right, Kim. All right. Whenever you're ready. Thank you, Your Honor. Judge Costa, you asked, didn't MoneyGram list itself as a non-depository credit institution? And it did. But all that means is that it's not an FDIC-insured, federally chartered bank. And as I mentioned in my opening, Congress could have required that, but instead it looked at the function of what the institution does. And critically here, it looked at whether MoneyGram was regulated by state or federal regulations, subject to supervision by state or federal banking authorities. MoneyGram is subject to regulation by the state banking authorities, and it's subject to supervision and examination of their books. So one thing the FDIC does is goes in and examines the safety and soundness of the assets. That's what the state regulators do with respect to MoneyGram. And so MoneyGram satisfies all of the functional purposes that motivated Congress to give this favorable tax treatment. In the cases also bear this out. We cite the Valley Morris case from the Ninth Circuit, another Valley Morris case from the Second Circuit, and the Stoughton case. None of those cases were federally or state chartered banks. In both the Valley Morris cases, they were prohibited by law from receiving deposits in the strict banking sense of the word. And those courts said, nonetheless, those are banks for Section 581 purposes, because what they receive is functionally equivalent to deposits, because it's given, it's motivated by the security inherent in the deposit, and it can be directed to any third party or back to the depositor him or herself. You pointed out that, I think my friend on the other side pointed out that in 100 years MoneyGram or no other company has claimed this. Well, this has only happened twice, the Great Depression and the Great Recession. These are safe liquid assets. They don't just plummet in value every year. And so that explains why this is not some transom. This arose because of the Great Recession. And MoneyGram says, we fulfill the same functions as a bank. We're regulated like a bank for purposes of the state bank regulators. On official checks, I want to start there, because I think that's, in a way, the weaker argument for the Commissioner. And first of all, the Commissioner concedes twice in its brief, and it's undergirded by the stipulated facts, that banks, quote, outsource their official check services to MoneyGram. How can something not be a banking function if it was performed by a bank and outsourced to MoneyGram? These are individual accounts held in the name of the financial institution. So remember, that's one of IRS's complaints about money orders. You don't have an individual account with your name on it. Well, these financial institutions have individual accounts that are interest-bearing, and when they close that account, the money comes right back to the individual account holders. Their argument is, as I take it, is that safekeeping requires a voluntary element. You know, I have $20 in my wallet. I can put it under the mattress, I can go buy lunch, or I can keep it in the bank. And they're saying this official business, those are contractual obligations. They're required to give your client the money. So that's why it's not for there's a voluntariness element to safekeeping in the commissioner's view. My response is that checking customers can contract voluntarily with any type of restrictions with their bank. They may contract to have a minimum balance in their account that's going to restrict them from going and withdrawing it whenever they want. They may contract to have withdrawal fees that prevent them from withdrawing the money. And the fact that they're contractually required to deposit money sort of on a routine basis, I would urge the court to look at the second circuit, page 440. The commissioner made this precise argument in the same words. It said these depositors have, quote, a contractual obligation to transmit the funds. And the second circuit said it doesn't matter because they are making a deposit for purposes of safekeeping and they control those funds. I think the similar argument that they made is that there's an order of operations problem. But there is no order of operations problem. These bills that need to be MoneyGram must keep that money safe sometimes for days, weeks, or months until those clear. They're not already, you know, just instantly going to be paid. And in any case, it's no different than what we do every month. We deposit money in our account. We know that money is already pre-committed going out the door by the end of the month for mortgage, rent, electric bills, or whatever the case may be. And if I could answer one final point, I think Judge Oldham had a question, if I could answer that for 20 seconds. He had a question about the first day settlement funds. And the IRS's answer was those are just like security deposits. Well, they're not like security deposits because a security deposit goes for the purpose of protecting the landlord, for instance. This deposit is for the purpose of paying those first day's worth of checks. And it's for the purpose of protecting the depositor as well. It gives a balance in the restriction on what the official check customers do with that money. As we point out, the stipulated facts say these financial institutions often use this money, withdraw this money to pay their own bills, to write official checks to pay their own bills. That's no different than an official checking account. So we ask that the court would reverse. All right. Thanks to both sides. Helpful arguments in this interesting case. And you can now be excused.